# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0176
Filed May 13, 2026

————————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Mindy Jo Jones,**
Defendant–Appellant.

————————————

Appeal from the Iowa District Court for Allamakee County,
The Honorable Laura J. Parrish, Judge.

————————————

**AFFIRMED**

————————————

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye (argued),
Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino (argued),
Assistant Attorney General, attorneys for appellee.

————————————

Heard at oral argument
by Greer, P.J., and Buller and Langholz, JJ.
Opinion by Greer, P.J. Special concurrence by Buller, J.

1

**GREER, Presiding Judge.**

Mindy Jones appeals her conviction for first-degree arson and animal abuse causing serious injury or death. On appeal, Jones argues: (1) the district court abused its discretion in denying Jones's motion to strike a juror[1] for cause based on his alleged prejudging of the case; (2) the evidence was insufficient to prove she started the fire; and (3) the evidence was insufficient to establish animal abuse causing serious injury or death because of a lack of evidence that Jones's actions caused the dog's death by violence, force, or poisoning. Upon our review, we affirm Jones's convictions.

## I. Background Facts and Proceedings.

Jones's convictions arise out of a fire in a building she purchased in the winter of 2021–22 to develop a ground-floor retail space for her business, Tin, Rust and Harmony (hereinafter the store). The building had apartments on the second floor. On February 13, 2022, a fire broke out in the store and rapidly spread. An investigation determined the fire was intentionally set and that Jones had financial incentives to start the fire to collect insurance money. Jones was arrested and charged with first-degree arson (count I), a class "B" felony in violation of Iowa Code sections 712.1 and 712.2 (2022), and animal abuse causing serious injury or death (count II), an aggravated misdemeanor in violation of section 717B.2(4). We detail the facts relevant to each of the issues raised in this appeal.

**A. Jury Selection.** Trial began in the county where the fire occurred. During jury selection, fifty-four potential jurors were questioned individually in chambers about their preexisting knowledge of the fire. One potential juror, juror 35, expressed that he had "heard quite a bit" about the facts of

---

[1] We refer to this juror as "juror 35."

the case.  The State questioned the potential juror about what he knew and he responded:

> [JUROR 35]: I heard that there was animals involved and then there was, I think, a lady and two kids or something.
>
> [STATE COUNSEL]: Okay.  Okay.  What else have you heard?
>
> [JUROR 35]: I think I've heard that this wasn't the first time, maybe, that something like this happened.
>
> [STATE COUNSEL]: Okay.  And you've said a lot, so I'll try to divide it a little bit.  Do you know [Jones]?
>
> [JUROR 35]: No.
>
> [STATE COUNSEL]: Never met her?  Never seen her around?
>
> [JUROR 35]: I don't think so, no.
>
> [STATE COUNSEL]: You live close by?
>
> [JUROR 35]: Yeah.
>
> [STATE COUNSEL]: What you've heard, was it in the media?  In the news?  Or was it from people?
>
> [JUROR 35]: Word of mouth mostly.
>
> [STATE COUNSEL]: Was it not objective or was it—was it slanted one way or the other or was it—do you know?
>
> [JUROR 35]: It was mostly towards her doing it, I guess.
>
> [STATE COUNSEL]: Okay.
>
> . . . .
>
> [STATE COUNSEL]: Knowing what you've told us, if you were to be a juror in this case, one of the things or one of the roles that you take is kind of a different role.  What happens is when you step in a courtroom and get chosen as a juror, you take an oath just like you did this morning. And that oath requires you to decide the case on the evidence you hear in the courtroom.  Nothing else.  Which means that you have to set aside any

preconceived notions, any talk, anything like that, and just focus on the work you hear in the courtroom. You'll be told that the State—that the State of Iowa has what's called a burden of proof. We have to prove [Jones] guilty and that she is presumed innocent right now as she sits here until proven guilty.

[JUROR 35]: Yeah.

[STATE COUNSEL]: You've heard of this concept already.

[JUROR 35]: Yeah.

[STATE COUNSEL]: And so part of that, then, means that the State has to prove her guilty beyond a reasonable doubt and that your job is to come back with a verdict of guilty only if the evidence proves it beyond a reasonable doubt and only if that evidence is based from the courtroom. I've spoken at length. Knowing all that I have said, if you are instructed and you are chosen and asked to be a juror in this case, would you be able to do that?

[JUROR 35]: It would be a little difficult.

[STATE COUNSEL]: Okay. Can you tell us what the difficult part would be.

[JUROR 35]: I mean, I just heard it from people I know.

[STATE COUNSEL]: Okay. And I can understand that maybe that's a difficult task, but, again, if you take this oath and you are instructed this is what you have to do, will you be able to do that? Will you be—is the difficult so much that I can't do it or sure, if the Judge were to tell me this is my duty, this is what I have to do, and this is what I will hope to do, this is my job as a citizen to do in a trial, that you'll be able to do that?

[JUROR 35]: Then I have to, yeah.

[STATE COUNSEL]: You have to. What is—would you be able to set all that aside?

[JUROR 35]: I think so, yeah.

[STATE COUNSEL]: Is there one particular thing you've heard that you feel like is holding you?

[JUROR 35]: Nothing really specific, no.

[STATE COUNSEL]: Have you heard this from multiple people or one person?

[JUROR 35]: A couple different people probably. Three or four.

[STATE COUNSEL]: And you don't seem to have a specific thing you have heard particularly.

[JUROR 35]: No. Just that there was animals and people.

[STATE COUNSEL]: So back to my question that I asked before. Would you be able to follow those instructions and set all that aside and understand that what happens in the courtroom is you take a different job?

[JUROR 35]: Yep.

[STATE COUNSEL]: Will you be able to do that?

[JUROR 35]: Yes.

[STATE COUNSEL]: Would you . . . also be able to hold the State to its burden of proving the case beyond a reasonable doubt? And we're going to talk about what that is. Would you be able to do that?

[JUROR 35]: Yeah.

[STATE COUNSEL]: If part of that requires that you presume Ms. Jones innocent until proven guilty, that that presumption of innocence stays with her until the evidence proves her guilty, will you be able to guarantee her that presumption of innocence?

[JUROR 35]: Yes.

[STATE COUNSEL]: Despite what you've heard?

[JUROR 35]: Yes.

Next, Jones's counsel questioned juror 35.

[JONES'S COUNSEL]: . . . [T]here's already a little bit of prejudging going on about what happened and may or may not be guilty. Am I right?

[JUROR 35]: Right.

[JONES'S COUNSEL]: So you understand the rules and can follow the rules and things like that. But the honest answer is whatever that chatter is from those people, one of us is starting behind in this fight; right?

[JUROR 35]: Uh-huh.

[JONES'S COUNSEL]: And is that me?

. . . .

[JUROR 35]: Yes.

[JONES'S COUNSEL]: Okay. All right. So by way of example, if you hadn't heard anything at all about this case at all, you didn't have those friends coming by and stuff like that, we'd be dead even; right?

[JUROR 35]: Right.

[JONES'S COUNSEL]: But because of what you've heard and whatever slant it had on it, okay, we're starting behind in this case; right?

. . . .

[JUROR 35]: Yes.

. . . .

[JONES'S COUNSEL]: And so the reality is that—because I thought I heard you saying this. The reality is that, you know, set the rules, the instructions and stuff aside. Knowing your own gut and what you've heard, your ability to be impartial in this case just because of what you've heard, you can't guarantee us that you would be; is that right?

[JUROR 35]: Yeah.

Jones challenged juror 35 for cause, and the State objected. The district court denied the motion but stated that parties could continue questioning juror 35 during group voir dire or raise another motion. During group voir dire, neither the State nor Jones inquired further about juror 35's

6

bias.  Neither Jones nor the State used a peremptory strike on juror 35, and he ultimately was seated on the jury.

**B.  The Fire and Following Investigation.**  Jese Lewey was at the store the night of the fire.  His mother is Jones's cousin.  He previously had a close relationship with Jones, living with her for a time and referring to her as "mom."

On the day of the fire, Lewey had retrieved some personal items from a garage.  He called Jones to see if he could keep them in the store's basement.  Jones agreed and gave him the code to get into the store.  When Lewey arrived, he could not get the door open and asked Jones for assistance.  Jones was down the street at a bar, less than a minute walk from the store, and came to help.  She told Lewey to drive around back and she would unlock the back door for him.  Lewey and Jones were the last two people in the store area.

Lewey entered the store from the back and went down to the basement to see where he could store his items.  During his testimony at trial, he went back and forth on whether he carried items downstairs or not.  He attributed his lapse in memory to the passage of time since the fire.  In any event, he came up from the basement to the front of the store to use the restroom and found Jones had already left.  Surveillance footage from a nearby business showed Jones walking toward the store and then walking away from the front of the store about three minutes later.  As Lewey headed to the front of the store, he "saw kind of a flicker" that turned out to be a fire under the counter.

Lewey called Jones to tell her that the store was on fire.  Jones said, "What?" and then, "Call 911."  On the 911 call, Lewey suggested that the source of the fire was electrical due to "overloaded" power strips in the store.

Lewey testified that he did not start the fire and that he observed paper burning under the counter about two feet from the ground.

Several people rushed to the store, including a former employee and Jones. They helped to evacuate the tenants from the upstairs apartments, including a family with pets and three small children. One of the family's dogs did not make it out. The family took refuge in a nearby restaurant to get out of the cold. Around 6:30 p.m., thirty firefighters arrived. After about thirty minutes, the firefighters found the missing dog at the bottom of the back stairwell and got her out of the fire. The dog's owner observed that her pet "was not doing really good." She assumed the dog had "breath[ed] in a world full of smoke," and the dog "smelled like she came out of a wood stove. Her eyes were really cloudy, and she pooped on the floor in there, and she couldn't stand." The family could not afford to seek veterinary treatment for the dog. The dog passed away the next morning.

The firefighters battled the fire until the next morning and later returned to make certain the fire was completely extinguished. The fire chief noted that the fire accelerated quickly, which could have been in part due to the store's contents. Because of the size and amount of damage done by the fire, the fire chief contacted the State Fire Marshal. On February 16, while the State Fire Marshal special agents were investigating the fire, Jones asked them if the fire seemed suspicious. An agent asked why she would consider it suspicious and Jones replied, "Just wondering." This exchange "piqued" the investigator's interest.

A special agent with the State Fire Marshal Division noted that the freezing weather made the investigation more difficult because of the ice buildup from the water used to extinguish the fire. The scene was secured, and although the investigation began immediately with agents collecting

interviews and other information, the building could not be safely entered until April for fear it would collapse.

The investigation revealed there were two distinct fires that started in the store: one under the counter, where Lewey said he saw the flames, and the other in the ductwork that led to the furnace. The vent to that ductwork was covered by a grate with openings approximately "three-quarters of an inch by an inch and a half" in size. A photograph of the vent after the fire was shown to the jury. The duct connected to the furnace in the basement. It was noted that Jones had a new furnace put in a few weeks before the fire, but Jones claimed the furnace was loud and the night of the fire she heard a buzzing in the store.

Investigators opened the furnace and found a cloth "perfectly centered in an area that it really wouldn't have easily been accessed." "[I]t would be incredibly difficult for it to fall through one of the openings from the damage of the collapse and work its way to the center." Upon further examination, the material matched a sweatshirt that was found in the debris from the store. As the investigators opined, it was "[m]ore than likely," that a person put the sweatshirt in the furnace. The special agent testified that for the fabric to get through the grate on the vent and fall into the furnace, it would have required "significant force" and the chances of that happening accidentally were "very slim, if not impossible." However, it was concluded that the piece of cloth in the furnace did not create the fire. The special agent testified that it is a common misconception that placing cloth in a furnace would cause a large fire.

Tests were negative for accelerants, but the special agent testified, "[T]hat doesn't necessarily rule out that there wasn't an accelerant used" as the water used to put out the fire could impact the test. An empty diesel fuel

can was found in the store. The fire investigators were never made aware of anything in the store that required diesel fuel. Tests were also done on "a lamp, some power strip surge protector cords, an extension cord, and then the electrical components that were on top or near the counter, the internet modem, [and] the point of sales system." Testing confirmed those sources were not the cause of the fire, except the test on the point-of-sale system was inconclusive. The special agent testified that "we can safely rule out that this fire was caused by electricity."

The special agent opined:

> Based on the scene examination, based on all the information and evidence that we had gathered, my professional opinion is that this fire was intentionally set, that this fire was incendiary in nature; that there were two areas of origin that did not come together. There was one behind the sales counter and there was one in the area of the cold air return ductwork which contributed to the overall rapid growth of this fire and heat generation and overpressure within that compartment of this store.

An independent fire investigator confirmed these findings.

**C.  Jones's Insurance.**  Jones had missed two insurance coverage payments for her store. Then, two days before the fire, she made a payment, and her policy was in force at the time of the fire. The building was insured for $846,000. Under her insurance contract she could access that coverage to build a new building. If she decided not to rebuild, the insurance payout was $350,000 and the policy also included an additional $100,000 for lost inventory. From that payout, the amount owed on the mortgage would be paid to the bank.

Jones spoke to one of the State Fire Marshal special agents on February 14 and said that her lost inventory was worth $100,000, equipment costs were $900,000, and it would cost $857,000 to replace the building. She

commented, "I'm probably overinsured." Yet, when she spoke with an agent from the Bureau of Alcohol Tobacco, Firearms, and Explosives on February 17, she was unsure about her insurance coverage.

Shortly after the fire, Lewey, his mother, and Jones met with her insurance agent. When they were walking into the meeting, Jones "grabbed [Lewey's] arm and just gave it a squeeze and said, 'Follow my lead.'" He interpreted that to mean "[j]ust kind of button up and do what you're told." Lewey said that Jones had accused him of starting the fire. After this meeting, a former employee had a conversation with Jones about the insurance investigation. Jones had spoken with one of the insurance investigators and was upset. When asked why she was upset, Jones "said that [Lewey] had not said what she had told him to say." Eventually, Jones stopped cooperating in the insurance investigation.

Jones seemed unbothered about previous concerns over the store's safety. A former employee of the store testified that she noticed lights flickering and suggested Jones "get them checked out" and Jones replied, "I have really good insurance." Lewey noted a similar conversation with Jones when this potential danger was brought to Jones's attention previously: "It was shrugged off and just claimed that she had good insurance." Another former employee said that when concerns were raised about too many electrical devices being plugged in, Jones replied, "I got good insurance." Likewise, the tenant complained to Jones about the back stairwell being frozen shut and causing a safety risk to which Jones responded, "I have the best insurance."

**D. Jones's Financials.** The State introduced evidence of Jones's financial struggles. Jones bought the store for $62,000 with a loan from the bank and obtained an additional loan for remodeling and equipment. At the

time of the fire, Jones owed $181,418.57 on her mortgage for the building and an additional $35,000 on a construction loan. On February 11, Jones had gone to the bank holding her mortgage and presented the banker with a purchase agreement for someone offering $75,000 to purchase the property. The bank discouraged the deal as the purchase price "would not be sufficient enough to settle her debts with [them] on the building."

The evidence established that Jones's business was struggling financially. In December 2021, the store's bank account balance was negative $1,579.92. The following month, the store's bank account was negative $1,002.07. However, she previously had more debt, and though still negative, the business's bottom line appeared to be trending upward. A business colleague of Jones, whom Jones owed commission and additional debt, testified that Jones owed her nearly $45,000. On February 11, through certified mail, the business colleague's attorney sent demand letters for around $35,000 of the outstanding debt to Jones. On February 12, the day before the fire, Jones signed to acknowledge receipt of these demand letters.

An employee, who was working in Jones's other business and occasionally helped at the store, had issues with her wage checks bouncing in September until she quit in January. Lewey's mother, testified that when she worked for Jones, she received several checks that bounced although Jones corrected most of them. She also reported that there were issues with vendors not being paid and orders not being filled. Jones lost two employees because she could not pay their wages. In January, she closed another business she had in Minnesota because she "was going broke" due to repair costs. On that business's mortgage she owed $250,000.

A few days after the fire, Jones told an investigator that there was an agreement in place to buy the store and she was going to purchase another

12

property in town for $440,000 in June 2022. She described the store "as a money pit" with "a lot of unexpected costs with the building, there was a lot of problems, and not what they expected when they bought it." She also had to spend $60,000 in repairs for her other business.

Additionally, Jones had around $5,000 in credit card debt and owed $40,000 on a car loan. Jones's former landlord testified that her rent checks from December 2021 until she moved out in February 2022 "did not clear the bank." Jones owed the landlord $2,400. Jones eventually paid the landlord some money in the fall but still owed $1,500. On top of all that financial strife, Jones also had a 2015 civil judgment against her in the amount of $461,719.

The jury found Jones guilty on both counts. Jones appeals.

## II. Error Preservation.

The State challenges error preservation as to Jones's first argument that the district court abused its discretion in denying Jones's motion to strike a juror for cause. While the record is not a model of clarity, we assume without deciding that error was preserved and proceed to the merits.

## III. Standard of Review.

Our review of a district court's ruling on challenges to potential jurors for cause is for abuse of discretion. *State v. Jonas*, 904 N.W.2d 566, 570 (Iowa 2017). "The district court is vested with broad discretion in such rulings." *Id.*

"We review the sufficiency of the evidence for correction of errors at law." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (citation omitted). We give great deference to the jury's verdict and uphold it if substantial

evidence supports it. *Id.* "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "[W]e view the evidence in the light most favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* (internal quotation marks and citation omitted)).

### IV. Analysis.

On appeal, Jones argues that the district court erred in failing to strike juror 35 for cause. She argues that because juror 35 served on the jury and she can prove prejudice, her conviction should be vacated and remanded for a new trial. Additionally, she makes two challenges to the sufficiency of the evidence. She argues that both of her convictions should be vacated and remanded because of insufficient evidence that she started the fire. Alternatively, she argues that, even assuming that she set the fire, there is insufficient evidence that she "caused death or serious injury to the dog by violence, force or poisoning." Thus, she contends the animal-abuse conviction should be vacated and remanded for dismissal. We review each issue in turn.

**A. Striking Juror for Cause.** In this small-town Iowa case, fifty-four people called to serve in the jury pool indicated they had knowledge about the fire.[2] Many of those interviewed in camera were dismissed because of fixed opinions or actual knowledge of circumstances that might be inadmissible at trial, twenty-four in total. As for juror 35 who was questioned but not dismissed, we must decide if the district court abused its discretion

---

[2] After jury selection was completed, we note there were only eight other potential jurors from the remaining pool available for service.

in denying the motion for cause. After juror 35 was interviewed, Jones made this objection:

> I would move to recuse him. I mean, the reality is . . . that we've had a couple start that way, but they know they've heard these things. There's a little bit of detail in there. It's a small town, and we don't know what else he's heard. He knows he'd be a good juror but for the fact he's heard about this. And the kind of I will follow the rules is not the same as I can be fair and impartial, Judge.

The district court determined that the personal knowledge of juror 35 did not rise to the level requiring a strike for cause. So, did the court abuse its discretion? Though district courts have broad discretion "in allowing or disallowing challenges for cause in criminal cases" this "discretion is not unlimited." *Jonas*, 904 N.W.2d at 574.

> I just want to point out for the record that I'm aware of Iowa Rule 2.18(11), a rule of criminal procedure, which is the preserving for appellate review when the judge denies my motion for cause.
>
> I discussed with counsel and my client whether we have failed to preserve that for appeal we want to identify somebody we wanted to strike after we had fully vetted the juror and before we even get to the strike phase. I just wanted to make sure that was a part of the record.

At best, Jones mentioned the potential of an additional peremptory challenge, but the record does not provide any further detail that identifies which jurors Jones was referencing. It is clear that Jones asked that juror 35 be excused because of his statements but then left him on the jury. The *Jonas* guidelines are put in place to avoid a defendant "from engaging in a sandbagging approach of awaiting the results of a jury verdict before crying foul." *Id.* at 583.

15

Jones asserts the district court erred in failing to strike juror 35 for cause under Iowa Rule of Criminal Procedure 2.18(5)(k) and (o). Under rule 2.18(5)(k), a juror may be challenged for cause if the juror has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." Here we cannot assume prejudice under rule 2.18(5)(k) because Jones did not use her peremptory strike on juror 35 and did not request an additional peremptory strike after exhausting the rest of hers. *See Jonas*, 904 N.W.2d at 583 ("[I]n order to show prejudice when the district court improperly refuses to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted."). Thus, our focus is on whether the "the circumstances indicate the juror would have an actual bias for or against a party." Iowa R. Crim. P. 2.18(5)(o).

"Actual juror bias occurs when the evidence shows that a juror, in fact, is unable to lay aside prejudices and judge a case fairly on the merits." *State v. Webster*, 865 N.W.2d 223, 236 (Iowa 2015). Juror 35 stated that he had some knowledge of the case prior to trial and had "heard that this wasn't the first time, maybe, that something like this happened." He noted that he had heard this information from about "three or four" people and what he had heard "was mostly towards [Jones] doing it." He did not know Jones, nor did he have specifics about the case besides animals and people being involved. *See State v. Jordan*, No. 23-2086, 2025 WL 2793583, at *4 (Iowa Ct. App. Oct. 1, 2025) ("While Jordan argues juror 14's statements suggest he 'would be at an unfair disadvantage' if juror 14 was allowed to serve on the jury, we note that juror 14 did not express a fixed opinion on the merits of the

16

case."). We determine that that juror 35's answers to these questions do not meet the "actual bias" standard that is involved under Iowa Rule of Criminal Procedure 2.18(5)(o). "Familiarity with the trial topic is different from a bias against the defendant or a preconceived view of his guilt." *State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *7 (Iowa Ct. App. June 17, 2020).

From our review of the voir dire examination of juror 35, when the State asked questions to determine juror 35's ability to be an unbiased juror, the responses affirmatively established he would "hold the State to its burden of proving the case beyond a reasonable doubt," "presume . . . Jones innocent until proven guilty," and "guarantee her that presumption of innocence . . . [d]espite what [he'd] heard." Yet, when Jones's counsel questioned juror 35, the juror answered with awareness of the "prejudging" that was happening in the community and admitted that Jones "start[ed] behind in this fight," which would not be the case if juror 35 had not already been told details about the incident from others. While juror 35 expressed some ambivalence in the answers depending on the questioner, he was not asked what specific details he knew, who told him the information, and whether it came from trusted persons with alleged actual knowledge. While juror 35 did reference rumors of guilt, he was not asked if *he* found Jones to be guilty.

Our observations of juror 35's ambivalence comes from a cold record, and although "[v]oir dire of prospective jurors should be trusted to expose any substantial prejudices among them," we are not privy to the specific facts that were forming juror 35's hesitation, except that they were based on rumors. *State v. Walters*, 426 N.W.2d 136, 138 (Iowa 1988); *see also Webster*, 865 N.W.2d at 237 (noting the very purpose of voir dire is "to smoke out actual juror bias"). The district court removed a number of potential jurors for expressing actual bias, and we should defer to its privileged position to

observe both the questioning and the demeanor of juror 35. This is clearly a case where the juror's position changed depending on which counsel was questioning him. In any event, we find it telling that the juror involved was not struck by Jones using a peremptory challenge.

In sum, we give the district court wide discretion in ruling on challenges for cause giving credit to its firsthand view of the panelist's demeanor when answering the questions posed. *Jonas*, 904 N.W.2d at 586 (Waterman, J., concurring specially) (noting the "trial judge's estimation of a juror's impartiality" is influenced by "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty" (citation omitted)). As juror 35 did not express any actual bias against Jones and confirmed he would follow the directives of the court, we defer to the court's decision. Given the broad discretion we afford the district court, we find it did not abuse that discretion in overruling Jones's challenge to strike juror 35 for cause.

**B. Insufficient-Evidence Claims.** Jones challenges the sufficiency of the evidence supporting her convictions for arson and animal abuse causing serious injury or death. Upon our review, we note that "[e]vidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) (citation omitted). Here, the jurors were instructed to return a verdict based on the instructions, evidence, and their "reason and common sense." "Factfinders are allowed to rely on common knowledge, history, common sense, and experience and observations of the affairs of life." *State v. Brice*, No. 19-0863, 2020 WL 3264401, at *4 (Iowa

Ct. App. June 17, 2020) (citing *State v. Stevens*, 719 N.W.2d 547, 552 (Iowa 2006)). We approach each of Jones's arguments separately.

1. *Evidence of arson.* The State was required to prove that (1) Jones "caused a fire [at] or near" the store, (2) Jones "intended to destroy or damage the property or knew the property would probably be destroyed or damaged," and (3) "[t]he presence of a person in the property could have been reasonably anticipated."[3] Jones does not dispute the conclusions of the fire investigators that the fire was intentionally set. Instead, Jones only argues that it was not she who started the fire and that the State only offered circumstantial evidence focused solely on her financial situation.

First, we consider whether substantial evidence supports the contention that Jones caused the fire. Jones traveled to the store that evening to let Lewey in. Jones was in the building on the night of the fire, on the first floor where both fires were intentionally set. When Lewey came up to the first floor, he found that Jones had left, and then he saw a fire. In testifying about the fire investigation, the independent fire investigator walked the jury through photographs of the store after the fire and explained his conclusions from the scene. He concluded "there were two separate . . . and distinct points of fire origin." Like the State Fire Marshal, he concluded that one fire started behind the sales counter and the other at the cold air return duct. The fires resulted from "incendiary fires," which he defined as "a fire that is intentionally ignited in an area or under circumstances where and when there should not be a fire." Because of the passage of time in the investigation, it was true, as Jones argues, that the investigators were unable to identify an

---

[3] "Where, as here, the jury was instructed without objection, the jury instruction becomes law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018).

accelerant, but there was an empty diesel container found on site. A report with photographs from a forensic electrical engineer, relied upon by the investigator, showed that the inside of the furnace did not have signs of fire damage.

Further, the State Fire Marshal investigator testified about the "trail of evidence" found at the scene that related to the origin and cause investigation. Missing from the area where the fire started under the counter were electrical outlets or other potential electrical sources that might cause a fire. Likewise, the burn evidence showed extensive damage near a cold air return grate near a t-shirt rack, which lead the investigator to conclude there was a very intense fire directly below that area. He opined a fire had been created and was burning in the cold air return from this fire pattern. All other potential sources for the fire were excluded by the investigators involved.

This evidence supported that this was not an electrical fire but one intentionally set. The State provided substantial evidence to support this element.

Next, we consider the second element, that Jones intended to destroy the property. Under the policy terms, Jones is correct that to access the $849,900 insurance proceeds, she would have to rebuild and if she "walk[ed] away" she would collect only "$350,000." But the State offered evidence that Jones's finances provided a motive for collecting the insurance proceeds. Contrary to Jones's arguments, as the State points out, the "great insurance" she bought allowed her:

> a variety of positive outcomes: she could build a new building with a budget 13 times what she spent to buy the old one, she could buy a better building with a similarly generous budget, or she could walk away from the business altogether and collect roughly $170,000 after paying off her mortgage ($350,000 - $180,000).

Jones was overheard telling several people before and after the fire that she had good insurance or was probably overinsured. She was two months behind on her insurance payments and then caught up just days prior to the fire. Before the fire, Jones could not pay vendors, employees, or her own rent for her housing. She owed a merchandiser $45,000, had a $250,000 mortgage on her other business, owed $180,000 on the store's mortgage, owed a $461,719 civil judgment, and was overdrawn on the store's bank account. Just days before the fire, someone attempted to buy the property, but the bank refused the offer because it was over $100,000 less than what Jones owed on the mortgage. A day before the fire, she signed for certified mail that notified her of a $35,000 demand for payment on a cosigner's account. Thus, there was substantial evidence of Jones's motive to destroy the property.

Finally, there is substantial evidence of the third element as Jones would have known about the presence of others at the property. She knew that Lewey was there and was fully aware that her tenants would be at the property, supported by her effort to warn the tenants to leave.

Upon reviewing the record, we find a jury could find that Jones committed arson given the substantial evidence presented by the State.

2. *Evidence of animal abuse.* Under count II, the State was required to prove that (1) Jones "acted intentionally, knowingly, or recklessly; (2) Jones's "acts caused serious injury or death to an animal by force, violence or poisoning;" and (3) "[t]he animal was owned by another." *See Banes*, 910 N.W.2d at 639 (noting uncontested jury instructions become the law of the case for reviewing the sufficiency of the evidence). Jones only challenges the second element. Specifically, she contends that there is a "lack of evidence of the dog's cause of death or the dog's physical condition before the fire"

21

and that there was "no foundation for a conclusion that the dog died or was seriously injured by 'force, poison or violence.'" Jones argues that the mere proximity in time between the death of the dog and the fire is not enough to prove causation without a qualified witness on the dog's cause of death or serious injury.

We find there was substantial evidence in this case that Jones's acts caused the serious injury or death of the dog. Death by fire, as a forcible felony, would be described as a death by violence. Iowa Code section 702.18 defines serious injury as bodily injury creating "a substantial risk of death," "serious permanent disfigurement," or "protracted loss or impairment of the function of any bodily member or organ." Here, the thirteen-year-old dog was inside a burning apartment for thirty minutes. When the dog was returned to the owner, the dog was described by her owner as "not doing really good." The dog's owner assumed the dog had "breath[ed] in a world full of smoke," and the dog "smelled like she came out of a wood stove. Her eyes were really cloudy, and she pooped on the floor in there, and she couldn't stand." The following morning, the dog died. The jury was not presented with evidence of the dog's condition prior to the fire—the only photograph of the dog from before the fire was a decade old.

Though the jury was not given the dog's health information prior to the fire or a necropsy report on the dog's cause of death, the jury could rely on the evidence that was presented and their common sense. The dog's family lived in a walkup second-floor apartment, and the dog somehow got to the bottom of the back stairwell during the fire. Thus, the jury could reasonably assume that the dog could walk and stand prior to the fire. Additionally, there was testimony from the dog's owner and a firefighter that the dog was in the burning building for thirty minutes. The jury saw

photographs of the fire with timestamps, which showed the scale of the fire engulfing the building where the dog remained inside. In their lay experience, a jury could reasonably find that a dog inhaling smoke for thirty minutes could lead to serious injury or death.

Viewing the evidence in the light most favorable to the State, we affirm because substantial evidence supports Jones's conviction.

## V. Conclusion.

We find the district court exercised its discretion in overruling Jones's challenge to strike juror 35 for cause and that there was substantial evidence in the record to support the arson convictions against Jones. We affirm the convictions.

**AFFIRMED.**

Langholz, J., concurs; Buller, J., specially concurs.

**BULLER, Judge** (specially concurring).

I write separately with two practical observations. Both are products of controlling case law, and I worry each will rear its head in the future.

First, this case reflects the reality of jury selection for high-profile criminal trials in rural counties. About 14,000 people live in Allamakee County, and this case involves money-motivated arson of a mixed-use county-seat building that endangered a family and killed a pet dog. It's no surprise the facts were a hot topic for news coverage and conversation, nor is it surprising jury selection reflected that. In the past, high-profile trials like this might have been moved to a nearby county to avoid running out of prospective jurors after controlling for pretrial news exposure. But under recent case law culminating in *State v. Dorsey*, 16 N.W.3d 32, 42–47 (Iowa 2025), it is functionally impossible for either the State or the defendant to obtain a change of venue due to pretrial publicity without trying to pick a jury and failing. We are going to see more jury-selection records like this one as long as *Dorsey* remains the law.

Second, this case falls into a gap left open by *State v. Jonas*: What happens when a defendant could have used a peremptory strike on an arguably biased juror but didn't? 904 N.W.2d 566, 570 (Iowa 2017). Under *Jonas*, we don't presume prejudice unless the defendant expends a peremptory strike and requests another. *Id.* at 583–84. I am skeptical of presuming prejudice when a defendant declines to use a peremptory strike, gambles on a verdict, then cries foul on appeal. Given the "tedious" approach required by *Jonas*, it would be anomalous to grant relief on this record. *See* Samuel R. Reynoldson, Student Essay, *Peremptory Challenges on Appeal: Not Worth the Trouble*, 111 Iowa L. Rev. Online 62, 83–84 (2026).

I join the majority because these concerns can be left for another day.